UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| *Plaintiff*, | ) | |
| | ) | Case No. 1:15-CR-34-CLC-CHS |
| v. | ) | |
| | ) | |
| ANTHONY J. MALONE, JR. | ) | |
| | ) | |
| *Defendant*. | ) | |

REPORT and RECOMMENDATION

I. Introduction

Defendant Anthony Malone, Jr. is charged as a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Defendant moves to suppress evidence discovered during a search of his vehicle which occurred following a traffic stop on April 25, 2015 (Doc. 14). Because I find reasonable suspicion existed to extend the traffic stop in order to conduct a K-9 search of Defendant's vehicle leading to the discovery of two firearms in the vehicle, I RECOMMEND the Motion to Suppress be DENIED.

II. Facts

A hearing was held on Defendant Malone's Motion to Suppress on September 17, 2015. Chattanooga Police Officer Justin Headden, who conducted the search at issue, was the sole witness to testify. He testified as follows:

On April 25, 2014, Headden, who joined the Chattanooga Police Department (CPD) in January 2010,[1] was assigned to the CPD's Crime Suppression Unit. In addition to other duties, the Crime Suppression Unit tracks gang activity and gang membership in the Chattanooga area.

---

[1] At the September 17, 2015 suppression hearing, Headden testified he will have been employed by the CPD for five years in January 2016.

1

One of the Unit's responsibilities is to "validate" gang membership. Headden testified that to "validate" someone as a member of a gang requires an assessment in which points are given for engaging in certain activities associated with gang membership.

On April 25, 2014, Headden was patrolling on I-24 eastbound near the Rossville Boulevard exits when he observed a black Ford 500 sedan with window tint so dark he could not see inside the vehicle. He initiated a traffic stop because he believed the window tint violated state law.

Headden approached the vehicle and made contact with the occupants. Defendant was driving the vehicle, Saleeta Ellis sat in the front passenger seat, and Calvin Ringer sat in the back. Defendant produced his license and registration, and Headden returned to his patrol car to conduct a background check with the National Crime Information Center (NCIC) on all occupants. The NCIC check revealed both Defendant and Ringer had a history of arrests for narcotics.

At the time of the April 25, 2014, traffic stop, Headden also had information about Defendant and Ringer that he had acquired prior to the stop. Headden had had previous personal contacts with Defendant. He had stopped Defendant four or five times in the Chattanooga neighborhood of Alton Park. During some of those instances, Headden had smelled marijuana emanating from Defendant's vehicle and Defendant had given Headden consent to search his vehicle. During those searches, on multiple occasions Headden had found a spent roach or marijuana shake inside the vehicle.

While he had never met Ringer, Headden had received information from a confidential source (CS) within the previous month that Ringer carried a firearm. This CS was considered by Headden to be reliable because he had received information in the past three years from this

same CS which had proven to be correct and had led to at least five narcotic arrests and search warrants. After Headden received this information from the CS, he researched Ringer and determined he was a validated member of the Bounty Hunter Blood Street gang, a gang which had been involved in shootings with another gang in Chattanooga. Headden also learned police had executed a search warrant for Ringer's house and had arrested him for possession of cocaine for resale.

During the April 25, 2014, traffic stop, Headden asked the occupants where they were going. They responded that Defendant and Ringer had picked up Ms. Ellis from the west side of Chattanooga ("the west side") and they were going downtown to eat. This story did not make sense to Headden because Defendant and his occupants had passed direct routes from the west side to downtown Chattanooga and were now approximately two and a half miles from the west side and headed in the opposite direction of downtown.

After Headden ran the NCIC check, he directed the three occupants to exit the vehicle. At this point, using a hand-held electronic meter, Headden was able to determine that the window tint permitted only 15% of light to pass through it, thus exceeding the degree of tint allowed under Tennessee law. Defendant refused Headden's subsequent request for consent to search; therefore, nine minutes after Officer Headden had initiated the traffic stop, Headden called for a K-9 officer. It took twelve minutes for K-9 Officer Meador and his dog, "Duco," to arrive.

During a sniff search on the outside of Defendant's vehicle, Duco, trained to detect illegal drugs, alerted on the vehicle, and Headden commenced searching it. He found marijuana residue in one of the door handles, a Springfield XDM 9 mm in the middle console, and a Ruger .357 under the passenger seat. The Ruger .357 had the serial number filed off, and an NCIC check

3

revealed the Springfield XDM was stolen.  Headden placed Defendant, Ellis, and Ringer under arrest for unlawful possession of the firearms and read them their *Miranda* rights.  Defendant advised the vehicle belonged to him but that he had permitted his brother to drive it earlier that day, and he did not know the firearms were in the vehicle.  None of the occupants were charged with possession of marijuana because the amount of marijuana detected was too small to retrieve.  Officer Headden did not ticket Defendant for the window tint.

Following completion of the April 24, 2014, stop, Headden prepared an incident report. (Gov. Ex. 1).  The incident report includes a statement that a CS had recently informed Headden that Ringer carried a firearm and that Headden knew Ringer to be a validated member of the Bounty Hunter Blood street gang.  The incident report also includes a statement that an NCIC check revealed Defendant and Ringer each had a history of previous narcotics arrests.  The incident report does not state marijuana residue was found in one of the door handles; nor did it include any information about Headden's prior interactions with Defendant in Alton Park or that Defendant and his companions had articulated travel plans (going downtown to eat) incongruous with their location when stopped and with their direction of travel.

### III. ANALYSIS

At the September 17, 2015, hearing, Defendant conceded that Headden had a valid basis to conduct the traffic stop, *i.e.* probable cause to believe the window tint violated Tennessee law. *See United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) ("A police officer may legally stop a car when he has probable cause to believe that a civil traffic violation has occurred") (citing *United States v. Sanford,* 476 F.3d 391, 394 (6th Cir. 2007)).  However, Defendant asserts that Headden lengthened the purpose of the traffic stop outside Fourth Amendment boundaries by calling for the K-9 officer and conducting the dog sniff search, and, therefore, the firearms found

4

subsequent to the dog search must be suppressed as fruit of the poisonous tree.[2] *See Wong Sun v. United States*, 371 U.S. 471, 484 (1971).

The government bears the burden to prove by a preponderance of the evidence that a warrantless search falls within one of the warrant exceptions of the Fourth Amendment. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971), *United States v. Herndon,* 501 F.3d 683, 692 (6th Cir. 2007); *United States v. Oliver*, 686 F.2d 356, 371 (6th Cir. 1982). In *Rodriguez v. United States*, 135 S.Ct. 1609 (2015), the Supreme Court resolved a split among the circuits regarding the permissible scope under the Fourth Amendment of a warrantless vehicle stop for a traffic infraction. The Supreme Court held that while "the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention," *id.* at 1614, "absent the reasonable suspicion ordinarily demanded to justify detaining an individual," "[a]uthority for the seizure (the traffic stop) … ends when tasks tied to the traffic investigation are—or reasonably should have been—completed. " *Id.* at 1614-15 (parentheses added). Once the traffic stop is completed or should have been completed, officers must have, at the least, reasonable suspicion to continue the detention. *Id.* "Beyond determining whether to issue a traffic ticket," acceptable activities of a traffic stop include checking the driver's license, registration and proof of insurance as well as determining whether there are outstanding warrants against the driver. *Id.* at 1615.

Defendant asserts that, when Headden directed the occupants to exit the vehicle, which occurred before Headden tested the window with the light meter, he unconstitutionally extended the traffic stop because he had all the information he needed to issue a ticket immediately after

---

[2] Defendant does not challenge the reliability and credibility of Duco's alert on Defendant's vehicle nor does he challenge the seizure of the firearms provided there was reasonable suspicion to detain Defendant in order to conduct the dog search.

5

he completed the NCIC check. Using the light meter to test the window tint was reasonable and in keeping with the original purpose of the traffic stop. Consequently, I conclude Headden did not improperly extend the original purpose of the traffic stop by asking the occupants to exit the vehicle while he tested the window tint with the light meter.[3] I do find, however, and the government conceded at the September 17, 2015 suppression hearing, that Headden extended the original purpose of the stop when, after using the light meter, he did not issue the ticket but instead called for the K-9 officer. The government also concedes that, in order for the continued detention, *i.e.* the investigatory stop and resulting dog sniff, to pass constitutional muster, Headden must have had reasonable suspicion to believe criminal activity was afoot. *Rodriguez*, 135 S.Ct. at 1614-15.

"Reasonable suspicion exists where the officer can articulate specific, particularized facts that amount to more than a 'hunch' that criminal activity may be afoot." *United States v. Bridges,* __F.3d__, 2015 WL 5332448 *2 (6th Cir. Sept. 14, 2015) (quoting *United States v. Jeter*, 721 F.3d 746, 751 (6th Cir. 2013)); *see also Terry v. Ohio,* 392 U.S. 1 (1968) (An officer may detain an individual for a brief period of time for investigatory purposes where the officer has a reasonable suspicion based on specific and articulable facts that criminal activity is afoot.) Whether reasonable suspicion exists must be evaluated based on the totality of circumstance at the time the officer decided to make the investigatory stop. *Bridges*, 2015 WL 5332448 *2; *United States v. Davis*, 514 F.3d 596, 608 (6th Cir. 2008). An officer's experience and knowledge must be considered when examining the existence of reasonable suspicion. *Bridges*, 2015 WL 5332448 *3; *United States v. McCauley*, 548 F.3d 440, 445 (6th Cir. 2008). Further,

---

[3] Even if the traffic stop should have been completed at the point that the NCIC check was finished, my ultimate analysis would remain the same, and I would recommend the motion to suppress be denied.

"[r]easonable suspicion need not arise from an officer's direct observation, but can be based on informant tips and dispatcher information." *United States v. Gaston*, 776 F.3d 405, 408 (6th Cir. 2015) (quoting *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006)). "[Re]asonable suspicion 'can arise from evidence that is less reliable than what might be required to show probable cause.'" *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008) (quoting *Houston v. Clark County Sheriff Deputy John Does*, 174 F.3d 809, 813 (6th Cir. 1999)). Reasonable suspicion is also "considerably less" than what is required to show probable cause. *Houston,* 174 F.3d at 813 (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)).

In addition to the initial justification for the investigatory stop, in order to comport with the Fourth Amendment, the length of the detention and the manner of the detention must also be reasonable under the circumstances. *Terry*, 392 U.S. at 20; *United States v. Saucedo*, 226 F. 3d 782, 789 (6th Cir. 2000). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)); s*ee also United States v. Blair*, 524 F.3d 740, 750 (6th Cir. 2008) (the investigatory detention "must be justified at its inception, and it must be reasonably related in scope to the circumstances which justified the interference in the first place.") While there is no rigid time line on the length of an investigatory detention, "[a] court should instead 'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant....'" *Orsolini*, 300 F.3d at 730 (quoting *United States v. Sharpe*, 470 U.S. 675, 687 (1985)).

At the September 17, 2015, hearing, Headden testified that he relied on several pieces of information to determine reasonable suspicion existed to believe evidence of illegal drugs could

7

be found in the vehicle, *to wit*: (1) Headden had stopped Defendant on four or five occasions in a nearby neighborhood and had found marijuana shake or a spent roach in Defendant's car and/or smelled marijuana; (2) Within the past month, Headden received information from a CS who had provided reliable information in the past that the passenger, Ringer, carried a firearm with him; (3) Headden "validated" Ringer as a member of a gang active in Chattanooga; (4) Based on his experience, Headden knew that gang members involved in drug trafficking routinely carry firearms; (5) The NCIC check revealed both Ringer and Defendant had been arrested for narcotic violations; and (6) Defendant's professed travel plans were inconsistent with where he was stopped and his direction of travel.

Defendant argues that because Headden's incident report does not include any information about Headden's previous stops of Defendant or about Defendant's suspicious travel plans, Headden cannot be treated as a credible witness. However, as Headden testified, officers frequently do not write every detail in their incident reports because to do so would be extremely time consuming. I do not find the omission of such details in the incident report to undermine Headden's credibility in this instance. I observed his demeanor, considered his testimony carefully and find him to be a credible witness.

Defendant also argues that his direction of travel was not inconsistent with his stated travel plans, *i.e.*, to go eat in downtown Chattanooga, because he and his companions were only two and a half miles from downtown. However, as Headden noted, Defendant and his passengers passed closer, more direct routes from the west side to downtown Chattanooga, and were stopped two and a half miles from the starting point of those routes traveling in a direction opposite from downtown Chattanooga. Thus, I conclude Defendant's professed travel plans were inconsistent with his actual travel.

8

At the September 17, 2015 hearing, Defendant argued two particular cases supported his position that Headden lacked reasonable suspicion to continue the detention beyond the original purpose of the traffic stop. In *United States v. Blair*, 524 F.3d 740, 752 (6th Cir. 2008), the Sixth Circuit found an officer impermissibly extended a traffic stop beyond its original scope when, instead of writing a ticket for a burned out tag light, he called for a drug dog. His reasons for calling the drug dog were that he had stopped the motorist in a high crime area at 10:45 PM, the motorist appeared unusually nervous, and the motorist was reaching under the seats. The *Blair* court found those reasons insufficient to support reasonable suspicion to continue the detention. *Id.*

In *United States v. Goodwin*, 202 F.3d 270, *3-4 (6th Cir. Jan. 12, 2000) (unpublished), an officer observed two pick-ups parked side by side after dark in a new subdivision where houses were being built. There had been some recent acts of theft and vandalism in that general, though not specific, area. As the officer approached the vehicles, a Ford pick-up containing a driver and passenger began to pull forward. The officer initiated a traffic stop, ostensibly on the basis that the Ford pick-up had been blocking a public roadway in violation of state law. The driver exited and told the officer he and his passenger were "just messing around." The officer confirmed the driver had a valid license. The officer knew the driver was "someone connected with possible drug trafficking," information he had obtained from a confidential informant over a year prior to the stop. *Id.* at *1, *4. The officer also recognized the passenger "from the community as a user of illegal drugs." *Id.* at *1. Instead of writing a ticket for the alleged traffic violation after confirming the validity of the driver's license, the officer continued the detention and conducted a safety sweep of the vehicles for firearms. In a two to one decision, the *Goodwin* court held the officer lacked reasonable suspicion to continue the detention because "nothing occurred [during

9

the traffic stop] to generate a reasonable and articulable suspicion to detain Defendant beyond the purpose of the traffic stop." *Id.* at *4.

*Blair* is significantly different from the instant case. As outlined above, Headden had much more information about Defendant, his companions and their travel plans than the officer in *Blair* had about defendant Blair. The unpublished, split decision in *Goodwin* presents a closer case; however, both the qualitative and quantitative information in this case is greater than that in *Goodwin*. Headden had had four or five personal encounters with Defendant in a vehicle during Headden's then three and a half year tenure with CPD. In these encounters, Defendant had marijuana shake or a spent roach and/or marijuana odor in the vehicle. Defendant and Ringer had a record of arrests for narcotics violations. Headden had information obtained within the past month from a reliable informant that one of the passengers carried a firearm, and Headden had done his research and determined the passenger to be a gang member. Headden's law enforcement experience told him guns and drugs often were associated with each other. And, finally, Defendant's travel plans did not make sense. While none of the factors cited above, standing alone, would support reasonable suspicion, when considered together, the undersigned concludes that they do.

The undersigned also concludes the scope of the continued investigatory detention was reasonable under the circumstance. Twelve minutes elapsed from the time the K-9 officer and his dog arrived, and the sniff search was conducted immediately thereafter. Thus, the length of the investigatory detention was reasonable. During this time, Defendant and his passengers were allowed to stand outside their vehicle; thus, the manner of detention was reasonable. Once the dog alerted on the vehicle, probable cause existed to search it for illegal drugs. *United States v. Howard*, 621 F.3d 433, 453 (6th Cir. 2010) ("the alert of a properly trained and reliable drug dog

'is sufficient to establish probable cause for the presence of a controlled substance'") (quoting *United States v. Diaz*, 25 F.3d 392, 393–94 (6th Cir.1994)).[4]

### IV. Conclusion

For the reasons stated herein, I conclude Officer Headden had reasonable suspicion to extend the traffic stop in order to conduct a dog sniff search of Defendant's vehicle and that the scope of the investigatory detention was also reasonable under the Fourth Amendment. Therefore, it is RECOMMENDED that Defendant's Motion to Suppress (Doc. 14) be DENIED.[5]

s/*Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE

---

[4] Defendant does not contest Duco's training and reliability.

[5] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).